Bring in counsel for our final case, 24-019, United States v. Elbaz. Counsel we're ready when you are. Thank you. Your honors, may it please the court, Eric Brignac for Lee Elbaz. And this case obviously raises a lot of complicated issues about both the conviction and the sentencing related to the government's decision to prosecute this case domestically in the interest of our limited time and the amount of issues in this case. I wanted to start with the issue of the extraneous information brought to the juror number nine, which he then brought into the jury room, which I think is the most compelling issue in this case. In short, the Remmer presumption applies. The government did not rebut the Remmer presumption. This court must vacate that jury verdict. The situation that happened. Can you start with the first part of that? I'd love to talk to you about both of them. But start with the first part, because it's not directed at the juror and it's not the juror's own action. And so when we look at Remmer and it requires a private communication, contact, or tampering, why do we think this type of overhearing gossip qualifies for Remmer presumption? Now, it might well mean that prejudice can be established. But why do we think Remmer applies in this context, as opposed to context in which there is private communications that are directed at the juror? Two reasons, Your Honor. One based on this court's precedent and one based on the reason for the presumption. I think the Barnes case is the most relevant precedent on point for that. As Your Honors remember, that was the case where exhibits were completely inadvertently sent into the jury room. There were exhibits from a suppression hearing. The jury should have never seen them. And the Remmer presumption applied. In fact, the Remmer presumption applied. Right, but that's a private communication, right? Like if I sent you mail, right? So if I write a letter and I send it to you and you receive it, right? Like that's a communication to you, a private communication to the jury. That seems not dissimilar to the prosecutor grabbing somebody on the way out the door and saying, this guy's really terrible, or whatever it might be. I would respectfully disagree with that, Your Honor. I mean, the exhibits that were sent into the jury room were not done in Barnes with any ill intent, with anything other than inadvertent. So I think the Barnes analysis would have applied if those exhibits had been put in an ante room, and the jury had been sitting, cooling their heels in this ante room, and noticed these exhibits. It would have been inadvertent, and it would have prejudiced them, just like it did here. And I want to say, Your Honor. But that's the, OK, give me the second reason. Assume I'm not convinced by that one. Go to the second one. There are some doctrines in the law that are meant to discourage malfeasance from a party. There are some doctrines that say, if you intentionally, or knowingly, or negligently do something wrong, we're going to hold it against you. We're going to hold it against your client. That's not what's being protected here. What's being protected is that Sixth Amendment right to an impartial jury. And if Your Honors are familiar with Winnie the Pooh, it's all the same at the bottom of the river. If I fall down into the river, I don't care if I was intentionally pushed. I don't care if I slipped and fell. I don't care if the bridge was negligently constructed. Ms. Elbaz deserved a jury that did not have a juror who said, I heard this prejudicial information. It affected me. It made me think that acquittal was the wrong decision. I went into the jury room for an entire day of deliberations. All right, so stay on the, I mean, I understand you want to go to that point. I want you to get there. Do you contend that the Rimmer presumption would also apply to a news report? So if a juror walked past a newsstand and had an article, and they inadvertently, total inadvertence, but they look over and there's a news article, or they hear it on the radio on their way in, and they cut it off when they can, but they hear some portion of it, is Rimmer applicable there? Because courts don't seem to think so, and I'm having a little trouble with that. And if there are cases saying Rimmer does not apply there, Your Honor, I'm not aware of them. I think Rimmer would apply. In Your Honor's hypothetical, with this much more limited contact, it may be much easier for the government to rebut. But I think in that instance, the Rimmer presumption would apply. The cases, Your Honor, that parties have talked about where Rimmer did not apply. You know, in the Bouvette case, that was the case where the, I want to make sure I'm getting it exactly right, Your Honor, you know, that was the case where an email was sent to a juror completely inadvertently, had no idea he was on the jury, had nothing to do with the case. It was a communication, but there was no substance. Rimmer did not apply. In United States v. Basham, it was one-way communication. The juror was communicating with the media. The juror was sending information out. The media members. Those are two different parts. So Rimmer requires both, like, material information and it be a private communications, what it seems like to me. Those address the material aspect, right? Not the private communication piece. And, Your Honor, I would, yes, you're right. Neither of those address the private communication piece. Those are both about materiality. But what we're protecting here, Your Honor, is Ms. Elbaz's Sixth Amendment right to an impartial jury. This fundamental right. I mean, that's why this- And why did the court use the term, and I'll stop on this because I want to talk about other things. But why use the term private communication, contact, or tampering if what they meant is any public or private information, or any public or private communication, or any information that you get, right? I mean, your reading of it, which I accept, reads out the words that Rimmer itself uses, right? Well, actually, I think on the facts of this case, Your Honor, it need not. First, to answer your question, I do think Rimmer is broader than Your Honor is classifying it. But I also think that this communication that he overheard, which was not a news broadcast or something that the entire jury saw. It was two people next to each other. He overheard them. He understood what they said. He said it affected him. I do think that falls under Rimmer. And the burden then shifts to the government. And I do not think we have, I'd love to have a case exactly on point on that point, Your Honor. I don't. Because this is, thankfully, rare. A situation where something, we know a juror heard this. We know it affected him because he said it affected him. We know it affected him in a negative way. We know he brought it into the jury room for an entire day. And only after that did he think to bring it to the district court's attention. There are a lot of steps along that path that he could have taken, juror number nine could have taken, to prevent this from becoming the disaster it did. He didn't take those steps. And I don't think the government can then rebut the presumption based on what we have. We don't know how he affected the other jurors. And I know the government and their board. Can we consider the testimony? I said I was going to stop, but I wasn't being truthful. Can we consider his testimony that it affected the way he thought during that one day under 606B? I mean, we seem to have say in a different context when the government tried to rely on the mental impressions of a juror, we said under 606B we can't do that, that you can't use that to rebut the presumption in that case. But you're trying to use it here to bolster the presumption. Don't we have to not consider that at all under 606B? I disagree, Your Honor. And first, let me say, please keep asking questions. I care much more about what you care about than whatever I had written down here. Rule 606B on its own terms is about impeaching a verdict. And I did not, these cases are not in our briefs. There's not a lot of discussion. The Seventh and Tenth Circuits, and I apologize, I don't think I have those cases in front of me, have each talked about how 606B does not apply pre-verdict. Now, the district court and the parties in this case, and I think Ms. Elbaz's attorney even mentioned 606. And I think everyone was operating under the spirit of 606B. Let's keep this jury as black a box as possible. Let's not look under the hood any more than we need to. But I would say, Your Honor, if you look at 606B, it is about impeaching a verdict. And that's not where we were in this case. The verdict had not happened yet, Your Honor. So I actually don't think that it was improper. The district judge obviously was trying to keep the juror from talking about what he thought and felt. But let's even say that we don't know the fact that he was looking to acquit. I think this court can and should and must consider that. But let's say you decide that under the spirit of 606, you cannot consider that. I think we have still established a remor presumption that the government cannot rebut. Because what is still in there is this juror saying, yes, it affected me. Yes, I brought it into the jury room. It affected my two cents, what I told the other jurors. And that is why I think even the district court's valiant attempt to cure this, to ask the jurors to restart communications anew and the like, it doesn't matter. You can't put something out of your head if you don't know what's there. The analogy I came up with this morning is if someone slips strychnine into this water, and I drink it, and I get stomach cramps, I go to the hospital, and they say, have you had strychnine? What have you consumed? I say, no. I completely and honestly say, no. But if the poison's in your body, and it's unknowable, it's actually harder to cure that. The poison, whatever went into the jury, we don't know. And it's sort of like the Lawrence case, which was about the Wikipedia entry. And this court said, because we don't know exactly. We know these jurors looked at Wikipedia.  We don't know what it said. That's a fact against the government, because the government bears the burden. And so since we don't know what juror number nine said, we don't know how much poison seeped into the jury, they have the burden of rebutting that, not just rebutting it, showing that there's no reasonable probability that's affected the verdict. They can't make that. Judge Wilkinson, in the Stockton v. Virginia case, I think also talked about, at the end of that majority opinion in that case, and I would point out that was a habeas case, even in the face of the strong deference given to the state courts in that case, this court said that can't stand. And it was a more direct communication. Someone told the jurors, I think you should fry the son of a bitch. That was more direct than what we had in this case. But he talked about how the fact- But also, they told those jurors, and then those jurors went and deliberated and voted, right? I mean, they were the ones that voted. They remained on the jury, voted, I think in that case was the penalty phase, if my recollection is. The penalty was the death phase of it. Right, and then only after the fact was it realized, right? And so, the challenge I'm having, and I just want to make sure I've looked, and I have not found a case where there's only one juror that's tainted with the actual outside information. That juror is removed and does not vote. And deliberations are restarted by the court. I haven't found any of those, any case of that scenario that suggests that you get relief. And your honor, I would say I haven't, and I imagine if the government had, they would have found cases saying we don't get relief. This is a rare factual scenario, thankfully. And that's, I think, why we're having some trouble finding a case exactly on point. But I would say where this case, what makes this case more like Stockton, and less like these other cases like Basham and Bovet, is that it was substantive information that he admitted. If he had said, he admitted he brought it into the jury room. If he had said, your honor, I'm a really quiet guy. You know, on Thursday we deliberated, I didn't say much. Friday, I didn't say much. Monday, this was in my head, but I didn't say anything. And I was just a wallflower all three days. Then I think the government rebuts the presumption, because then there's no indication that the other jurors got this information. But just restarting the trial isn't enough. Again, in Stockton v. Virginia, Judge Wilkinson talks about this. You can't ignore the natural human tendency to want to go along with what you hear. In United States v. Barnes, the jury saw these exhibits, they didn't discuss them. The jury goes into the room, or these exhibits are sent, they realize something's wrong, they tell the court. Court tells them to put it out of their minds. You weren't supposed to see those, don't see them. And that wasn't enough. We said the jury just couldn't follow that instruction. Look, even in this case, we didn't raise it, your honors, as a point of error, but the government, in closing in this case, and I'll point you to, it's Joint Appendix 4312 through 4319. They had an exhibit during their closing, they put up on the screen for, I think, it was two or three seconds, and it had not been admitted into evidence. So the defense lawyer says, you know, the jury saw this, it wasn't admitted into evidence, we want to mistrial. District court said, you know, this was pretty egregious, but this was a cumulative exhibit, stuff they'd already seen, it was only on the screen for two seconds. He told the jury to disregard it, but interestingly, Joint Appendix 4319, he said, I'm gonna tell them to disregard it, but I'm not even going to explain what it was. Because, quote, it just sort of reinforces or creates a second wrong. It doesn't make it right. That was a recognition of the fact that when you have something, this is almost like toxic waste, it's almost nuclear. When you have something the jury's not supposed to see, what is an entire trial? An entire trial is basically deciding what these 12 people do and don't get to see. That's the entire apparatus we operate under. So you have that, and the district court here's like, I'm gonna be so careful, I'm not even gonna repeat it. I'm not even gonna mention it. Versus an entire day where he admitted, juror number nine admitted's the wrong word, juror number nine acknowledged, that yes, it affected what I say. Secret toxins pumping into the 11 other members of the jury. It's not enough, and my time is up. So no more questions. Thank you, thank you, counsel. I think we'll see you again in a minute. But Mr. Pierce, we're happy to hear from you. Thank you. May it please the court, James Pierce of the United States. The district court correctly concluded that this case involved a permissible application of the wire, a permissible domestic application of the wire fraud statute. It did not abuse its discretion when it denied the defendant's mistrial motion. And the sentence that it imposed, including the lost calculation, the restitution and supervised release conditions was not erroneous. And I obviously wanna focus on the mistrial question, which my friend on the other side did as well. To your questions, Judge Richardson, I think the Remmer presumption doesn't apply here, because what Remmer guards against are communications directed at jurors in their capacity as jurors. So tell me why the first principle's fine, but we have this Wikipedia case where the juror reads Wikipedia about the issue of promotion in a case. And we say Remmer applies there, right? And so if Remmer applies to Wikipedia, why doesn't it apply to gossip overheard in the supermarket, right? I mean, first principles I understand, but how do you distinguish Wikipedia from gossip? So I think in Lawson is the case there where there's the consideration. I think that is an active effort by the juror as a juror reaching out, right? So I think that actually looks a little bit like Basham and Blauvelt as well, where the juror is acting in his or her capacity as a juror to try to get information. I mean, in Basham, it's, hey, why aren't you covering this? In Blauvelt, it's more of, yeah, I'm a juror, I appreciate what you're doing, but that person is still acting in a capacity as a juror. Absolutely being a juror- But the challenge is it's not, it's not, if we're applying the Remmer idea, right, of private communication, contact, or tampering, it's not any of those, right? I mean, we're applying Remmer beyond its own terms to sort of a media type website that was seen intentionally, but Remmer doesn't talk about intentionality, right? If it's accidental or purposeful, doesn't seem to matter in the Remmer cases, and we apply the Remmer presumption to Wikipedia, so why not apply it to gossip in the same way? Right, I do think the inadvertence point might come in at the second step if the presumption applies, but- I get that, but not at the first step. Right, still, I think there is that difference, and I agree, I think Lawson is perhaps broader than how Remmer was initially conceived, but I still think there's a way to distinguish it in that you have a juror, the juror in Lawson is not looking up this term unless it's directly related to her, I can't remember if it's a his or a her, function as a juror, right? I think that is distinguishable from somebody who happens to go out to dinner and see on the TV news damaging evidence not admitted by the court, and isn't operating out in the public as a juror, hasn't sought out that information as a juror, that was just an overhear, and I think that's not what Remmer guards against. So why? I mean, it seems like in Remmer they're concerned about the influence this can have on the jury, and we can't probe the jury after the fact about how did it affect your thinking, and so they create a presumption, and I'm struggling to understand why it matters for that presumption whether someone was looking at a website as a juror, or walking down a street as a juror, or whether someone intentionally called them and spilled the beans, or someone accidentally did it in CVS. Why does it matter for the purpose of the presumption? To be clear, I think it's absolutely appropriate that a district court judge in either of those settings would perform a colloquy and ensure that the juror in question would be able to deliberate, I mean, mapping it out to the facts here where you have it happen before the actual verdict, and ensure that the juror can deliberate and render an impartial verdict. But I do think what it guards against at its core is efforts, private communications, to tamper with the juror. Not to say that there's a place to inquire if a juror overhears, or the information comes from a juror's own efforts to go and ascertain outside information. I think it's appropriate for a judge to inquire. I just don't think that the Remmer presumption should come into play. I mean, what seems different to me here, and I know there are cases applying it during the trial, but what seems different here is that it's before the verdict is rendered, right? Remmer is in the, we're kind of looking backwards and saying, well, what do we do now that we have this verdict and we have the rules, we can't impeach it. But when you catch it in the moment, why do we even need the presumption at all if we can actually find out? I mean, the jury here is already deliberating, so maybe the argument is once they've already gone into the room, you're in presumption territory. But it's a little different, isn't it? I think it is quite different, and I think Judge Richardson raised earlier, I am also not familiar with any case in which a court has had to apply the Remmer presumption when you had something before a verdict had issued. For what it's worth, I think the way the judge, and it was Judge Hazel at this point, described the Remmer presumption as descriptively accurate, that it guards against, I think he used the word something, efforts to infiltrate the jury or something more nefarious. But even where this court to apply the Remmer presumption, and the court below sort of punted on the issue and said, I'll just go straight to whether or not the government has rebutted it, I think the evidence clearly shows the district court didn't abuse its discretion in concluding that the government had rebutted it here. And I think the two points in which the district court relied are critically important. One, of course, is that the information that Juror 9 overheard under these, I mean, I think, unusual circumstances at best, you know, hearing damaging information, never conveyed that to the other jurors. And we know that not only because that's what Juror 9 said during the colloquy with the district court, but also because the district court went and had an individualized voir dire of each of these other jurors to ensure that they had not heard any outside information. And I know this wasn't part of the discussion here, but my friend on the other side argues, well, that itself was prejudicial. But imagine if it had gone the other way and the district court hadn't done that inquiry. We'd be up here today and the question would be, how do we know, other than Juror 9's own word, that there wasn't some information that actually got to these other jurors? We've never heard from them at all. And so I think under those circumstances, the district court taking the step of ensuring that there wasn't that kind of taint or toxic waste or poison, these various characterizations that my friend on the other side makes, none of that got to the rest of the jurors. And then secondly, of course, because of this unusual posture of having it arise while the deliberations were still going, the district court had the tool of replacing this juror with an alternate, giving the jury the instruction under 24C3 that you wipe your head, you start again, you start to deliberate with this new juror, and you move forward. And of course, we presume that jurors follow that instruction. And there is no Remmer case in which the jury, whether it's one juror or the entire jury, that ends up issuing the verdict, has no one on there who's come into exposure or has touched the damaging information. Now, if there are any other questions on the Remmer point, I'm certainly happy to address them. I have plenty of things to say about the extraterritoriality of the other issues, but I don't want to get into that unless the court has particular questions. So I don't need to, obviously that didn't come up here. So I would just offer to answer questions rather than make affirmative arguments. I'll ask a question. Okay. This is the least important point in the case, probably, about supervised release, because my understanding is when she's released from prison, she'll be going home, right? So supervised release may never happen. But there's been an argument about explaining the conditions of supervised release. A lot of them seem pretty self-evident, but I wanted to ask about the mental health treatment. I know the guidelines say that the judge should issue a requirement of mental health treatment if the judge has reason to think that there's a condition that could benefit from treatment. And I just wondered, I'm legitimately curious, because this is a big record, if you are aware of anything in the record that indicated there was a condition that could benefit from treatment, or if the judge was just thinking, you know, anybody who commits a crime like this probably needs a little help. So I want to answer your question and then make a couple of sort of additional glosses. The PSR, and I think it's around paragraph 111, and I don't have the PSR site, but I think it's around 111, or somewhere between 111 and 115, discusses, as PSRs often do, the mental health of the individual being sentenced. And it talks about how after, while the defendant's on pretrial detention, she has stress and she's been recommended for counseling and she likes that counseling and it has been helpful for her. And so I think that that would have been before the district court judge, as this is someone who has benefited from counseling and will obviously continue to serve quite a long period of incarceration and would continue to benefit from it while in incarceration. Just to make the points that we do in our brief, of course, the defendant didn't raise this below and didn't sort of challenge the judge into providing that explanation. And I think that's, you know, one of the reasons why it's either waived because it was never raised or, at best, reviewable for plaintiff. Right, it may not impugn the fairness or integrity of the proceedings. That's exactly right, Your Honor. Thank you. Since you're here, and when I think about the wire fraud convictions and I think this argument has been waived by your colleague, that the conspiracy is governed by the same analysis as the substantive offense, and your conviction is that they've waived the argument that there's a separate analysis if we look at the focus of the conspiracy statute from the other. But do you think that's right? And I understand this is, like, maybe a little beyond where you probably wanna be, but as a matter, you know, as an officer of the court, is it right for us to think about 1349 as having the same focus, necessarily, as 1343? So, yes, I do think they waived it in page 25, note four. I think the Ninth Circuit has done the same thing and said, when there's substantive and conspiracy law, we sort of, they ride together. As an officer- But it also, I mean, in that, the recent decision from Judge Press, he sort of says they don't make an argument to the contrary. He sort of assumes it away. I'm just, I'm curious whether that assumption and maybe it will remain that for this point, but whether you think that assumption is right. I think it's a lot harder for us because I think that the focus of a conspiracy provision like 1349 is the criminal agreement itself. And so mapping that onto a case like this, I think it would be difficult to argue that the criminal agreement happened in the United States. I think we would still argue that because the criminal agreement encompassed things like targeting victims in the United States, that it was broad enough to nonetheless amount to a permissible domestic application. But I do think absent things like overt acts happening in the United States, which the indictment here would have alleged and would have covered, I think that's perhaps complicated by the fact that I don't believe 1349 actually has an overt act requirement. Does it require them? It's hard to say that, you know, the focus of the statute is an element that doesn't exist, right? I think that's right. And I think that's why it would be a much more challenging case to rely on the conspiracy provision alone. But I agree that that's been waived and is not before the court in this case. All right, so again, since you're here, and obviously speak up, colleagues, if you have other questions. So sometimes we loosely describe 1343 as having two elements. And I think of it as having three, and I wanna make sure that you maybe agree or maybe don't, but help me understand why. So when we look at cases like Taylor, Taylor says it requires two things, right? The use of the wire and a scheme, shorthand, right? But in describing the use of the wire there, it doesn't refer to any sort of interstate or foreign nexus, right? So it just gives the use of the wire and the scheme as the two elements. And then it goes on in the following paragraph to talk about the interstate nexus as yet a third element. Is that the right way to think about 1343, that you have to use a wire, it has to be in furtherance of a scheme, shorthand, use or cause to be, I don't mean to shorten all that, but use a wire, a scheme, and then the wire must be in interstate or foreign commerce, what Taylor talks about as the interstate nexus jurisdictional piece. Is that the right way to think about 1343? Yes, I think it is. I think the point that the court in Taylor is trying to make is also borne out in its analysis, which is the sort of the conduct involved is the scheme and the wire itself. And I think the holding in Taylor was, look, the officers there didn't have to know that the wire, wasn't didn't have to be reasonably foreseeable to them that the wire would travel in interstate commerce, because all that is doing is, I don't say all, but what that is doing is providing the basis for federal jurisdiction over the offense. But I think it is absolutely an element that the government must prove as part of its case. There doesn't have to be any sort of knowledge requirement that attaches to it on behalf of the defendant. The defendants, they don't have to know that the wire goes in interstate commerce. But they do have to know, as I understand it, that the wire would be used, either they were using the wire or that it would reasonably foreseeable that it was caused to be used. That's correct. Right, and so that's why it really has to be three elements because the first element, the use of the wire, they do have to know that because that's the substantive element. The interstate nexus as a third element is the jurisdictional hook. They don't need to know that the wire itself crossed state lines. That's my understanding in my reading. And I think that's consistent with the way Taylor analyzes it. But you're right, the court, I think there does talk about it as two elements. Although I think in many courts use jury instructions that will say three and will say that the wire itself had to travel in interstate or foreign commerce. It's an element. Again, I stand ready to answer other questions. If not, I would ask the court to affirm the judgment below. Thank you, thank you, counsel. We're happy to hear from you on reply. Thank you, and again, considering the amount of issues in the case, much like Mr. Pierce, I mean, if there's things you wanna hear, I would rather answer your questions than. Do you disagree, just to go to that one point, that when Taylor describes two elements, neither of which include any reference to interstate or foreign commerce or interstate or foreign wires. And then the next paragraph talks about the third element, which is the interstate nexus. And that that's the right way to think about 1343. I would, Your Honor, say actually it is two elements. There are lots of cases saying it's two elements. And I think the wire is necessarily in interstate commerce. So I think the wire. No, but it doesn't have to be, right? So the issue comes up from time to time, depending on the nature of telephone systems and internet access, that you can use a wire that actually never crosses state lines, right? And so, but the act element is the use of the wire. The interstate nexus is a separate element. I think they're intertwined. I think they are one element, but I see your point. What's the best, I mean, so Taylor treats them as separate, right? So Taylor treats them as not being the same. Do you have a case that says that they are the same? And I guess, Your Honor, I just read Taylor differently. I think Taylor necessarily says that that, I mean, that's our whole argument about Taylor, is that that wire is the interstate commerce element. One thing I wanna say, as we're talking about, one decision this court has to make, I think we agree, was this domestic application, that Congress didn't expect this to apply extraterritorial, extraterritorially. So is the focus the wires, or is the focus the scheme? Now, I think in Hussein, McClellan, Napout, the First, Second, and Ninth Circuit cases, they all said, obviously, it's the wires. I would just caution this court. I think easy cases can make bad law. I think in all three of those cases, as we point out in our reply brief, there were enough domestic contacts that even if the focus had been the scheme, the scheme would have been domestic. There were domestic bank accounts. There was physical presence in the United States. And if this court adopts the wire theory, I would say, look at, it's the Southern District of New York case, Prevzion Holdings, where a wire's sent from South America to Europe, and it just happens to go through New York. If this court adopts the wire theory, then that suddenly becomes a domestic case. Well, no, it doesn't. I mean, the question of the focus, first, we have to decide what's the focus, and then we have to decide if there's sufficient here to make it a domestic case. It's not as though one wire, every future case where one wire happens to pass through the U.S. by happenstance becomes a case where the government can bring a domestic prosecution. Would you agree with that? I would not, Your Honor, if you say, because if you say that the point is protecting wires, then I don't see why you would say we don't care about protecting one wire. We don't care about protecting two. Like, if the focus- Those courts have said it's the use of wires and the furtherance of a scheme to defraud. That's the focus. Well, there's wires and there's the scheme. It's always wires and a scheme to defraud. So is the focus, as our cases argue, the ones we rely on, district court cases, but we agree with their reasoning, is the focus the fraud, the scheme, or is the focus the wires? The focus should be on the scheme. Now, even then, I think that gets us 80% of where we need to go, and 21 seconds left. I'll say there's still an argument that there was some domestic touching of the scheme here,  I wanna say one thing about the sentencing, Your Honor, of the Rogers-Singletary point. We would just note this sentencing happened before Rogers and Singletary, so we do not think the district court's reference to standard conditions was enough. But again, the district court did not have the benefit of this court's holding that it needed to implicitly or it needed to explicitly announce or incorporate a set of conditions. So we do think- Is that, so I'm just, maybe I'm misunderstanding those cases, but I understand those as being two different points, right? One, that you can incorporate standard conditions, that Rogers says that's okay. Rogers separately says you can explicitly incorporate non-standard conditions by reference to a PSR or something. But those are two different ideas. Is that not the right way to read, Rogers? No, those are two different ideas, and the point, Your Honor, is that when the district court here said standard and statutory conditions, or statutory and standard conditions, that, we don't know what standard conditions, if the district- But Rogers tells us that that's okay, right? I don't think so, Your Honor. I think Rogers says if you say the standard conditions in the guideline, the standard conditions in, at the time, the District of Maryland did not have a standing order, but if you reference a standing order, if you reference the list in 3583D, there's a list the Judicial Conference has put out. So if you say standard conditions, as he did here, as the judge did here, that's not enough. If he had said the standard conditions of the guidelines, that would have been enough. So the standard conditions of the guidelines were the standard conditions that were included in the PSR, and they're also the standard conditions that are the standing order that now exists in the District of Maryland, that didn't exist at the time. These are all the same. And in Singletary, they seem to assume that reference to standard conditions referred to those in the guidelines. So was anyone actually confused? And if they were, why didn't they object? I do not know if they were confused, Your Honor, but I will say, and I do not know why they did not object, I only rest on the point that if, when you say something like standard and statutory conditions when there's lots of lists of standard conditions floating around. But are there? That's not enough. There's lists in the statutes. There's 3583D. But the guidelines has a section that says standard conditions, and they're exactly the same as the ones that were in the PSR, and they're the ones that are applied here. What's the confusion? The court has to, so the confusion, Your Honor, is there has to be an express incorporation of a specific list. And the question isn't how similar are all these different lists floating in the air. And the question isn't even one of confusion. The question is, the point is you have the right to be sentenced in open court. And part of that sentence is the conditions. And part of being sentenced in open court is having an express specific list, which I'm sure the District of Maryland is, in fact, doing. In fact, they have a standing order now, Your Honor, in response to this court's cases. So I just, I wanted to say, obviously, the District Court, pre-Rogers, did not understand its obligations in a way I'm sure it would today. I see I'm significantly over time. Obviously, any questions? Happy? Well, we certainly appreciate your argument from both of you. We certainly wish we could come down and greet you, but I'm sure you understand our hesitation to do so at this point. But thank you for being here and presenting an excellent argument in a complex case. Thank you very much. Thank y'all. We'll stand in recess if the court will do so. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Julius N. Richardson, Allison J. Rushing, William B. Traxler Jr.